1  Polly A. Atkinson
   AtkinsonP@sec.gov
2  Stephen C. McKenna
   McKennaS@sec.gov
3  Securities and Exchange Commission
   1801 California Street
4  Suite 1500
   Denver, Colorado 80202
5  Telephone: (303) 844-1000
   Facsimile: (303) 844-1068
6
   David J. Van Havermaat Ca. Bar No. 175761
7  VanHavermaatD@sec.gov
   Securities and Exchange Commission
8  5670 Wilshire Boulevard
   11th Floor
9  Los Angeles, California 90036
   Telephone: (323) 965-3866
10 Facsimile: (323) 965-3908

11 Attorneys for Plaintiff United States
   Securities and Exchange Commission
12

13              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| 15 SECURITIES AND EXCHANGE COMMISSION, | CASE NUMBER |
| 16 Plaintiff, v. | CV11 02371 RGK (MANx) |
| 17 SPYGLASS EQUITY SYSTEMS, INC., RICHARD L. CARTER, | |
| 18 PRESTON L. SJOBLOM, TYSON D. ELLIOTT, | |
| 19 FLATIRON CAPITAL PARTNERS, LLC, FLATIRON SYSTEMS, LLC, AND | COMPLAINT FOR VIOLATIONS OF |
| 20 DAVID E. HOWARD II, Defendants. | THE UNITED STATES SECURITIES LAWS |

1    Plaintiff, United States Securities and Exchange Commission

2  ("Commission"), states and alleges as follows for its Complaint for

3  violations of the United States securities laws against Defendants Flatiron

4  Capital Partners, LLC ("Flatiron Capital"), Flatiron Systems, LLC ("Flatiron

5  Systems"), David E. Howard II ("Howard"), Spyglass Equity Systems, Inc.

6  ("Spyglass"), Richard L. Carter ("Carter"), Preston L. Sjoblom ("Sjoblom"),

7  and Tyson D. Elliott ("Elliott"):

8                                 SUMMARY

9    1.    From November 2007 through January 2009, Howard, using his

10  entities Flatiron Capital and Flatiron Systems, and Carter, Sjoblom and

11  Elliott (until August, 2008), using their company, Spyglass, engaged in a

12  scheme to defraud almost 200 investors located in approximately 38 states,

13  resulting in investor losses of over $3 million.

14    2.    As part of the scheme, Howard, Flatiron Capital, and Flatiron

15  Systems offered and sold unregistered securities which were sold to

16  investors through Spyglass, a telemarketing firm functioning as a "boiler

17  room" located in Los Angeles, California.  During the scheme, defendants

18  made materially misleading statements and omissions to investors

19  regarding the securities being offered by Flatiron Capital and Flatiron

20

1  Systems (the "Flatiron entities") and two stock trading systems that were

2  used to induce investors to invest their funds.

3      3.    Pursuant to the scheme, the defendants agreed that Spyglass

4  would locate individuals to purchase membership interests (i.e., securities)

5  in Flatiron Capital and Flatiron Systems, which Spyglass telemarketers did

6  through cold-calling and high-pressure sales tactics.  Using scripts and lead

7  lists, Spyglass telemarketers, under the control of Elliott, until May, 2008,

8  Carter, and Sjoblom, fraudulently touted two different stock trading systems

9  that purported to trade stocks profitably for investors based on algorithms

10  or computer models.  In order to close sales, the Spyglass telemarketers

11  grossly misrepresented the functionality and operational success of the

12  trading systems and the fees to be charged investors.  Among other

13  misrepresentations, they stated that the trading systems had achieved

14  successful historical results.  They stated or implied that the Flatiron

15  entities were legitimate broker-dealers, clearing their trades through

16  nationally-known brokerage firms, and that separate brokerage accounts

17  would be established for each investor which would be used in trading

18  utilizing the trading systems.  These statements were false.  In reality, the

19  trading systems had not been successfully used.  The Flatiron entities were

20  not legitimate broker-dealers and they did not clear trades through

1 | nationally-known brokerage firms.  Instead, Howard and others

2 | commingled investors' funds in trading accounts established at unaffiliated

3 | trading companies.  Howard along with others conducted unprofitable

4 | trading in the trading accounts, using a variety of strategies, not limited to

5 | the trading systems.

6 |     4.    As part of the scheme, Howard and the Flatiron entities made

7 | additional misleading statements and omissions to investors.  For example,

8 | in written materials provided to investors, Howard and the Flatiron entities

9 | falsely represented or implied that trading would be limited to the purported

10 | trading systems, that investor costs would be limited, and that investors

11 | would have separate, "designated" accounts.    Howard also made several

12 | false and misleading lulling statements to investors as the scheme

13 | unraveled, going so far as to subsidize several investors, falsifying their

14 | account statement to reflect inflated results.

15 |     5.    By late 2008, the scheme failed as the trading systems and

16 | other trades placed by Howard and others were unprofitable and investors

17 | incurred substantial losses.  Howard made desperate attempts to pacify

18 | investors by falsely claiming he was conducting an audit of a non-existent

19 | entity. At the same time, Spyglass, Sjoblom and Carter were receiving,

20 | and rejecting, requests from investors for reimbursement of their license

1 fees.  Shortly thereafter, the defendants ceased operations, their phones

2 were disconnected or the numbers were changed, and investors were left

3 in the dark.

4       6.    Each of the defendants profited from the scheme.  Howard

5 misappropriated nearly $500,000 in investor funds, over $300,000 of which

6 he used for personal expenses, including travel, personal and adult

7 entertainment, and gifts for his girlfriend.  During the scheme, Spyglass

8 earned "licensing fees" (i.e., commissions) of approximately $1,130,000.

9 Spyglass then made payments from the investor money of approximately

10 $139,260 to Carter, $170,988 to Elliott, and $208,916 to Sjoblom.  Howard

11 also received payments of at least $20,400 from Spyglass.

12       7.    The Commission brings this civil action seeking permanent

13 injunctions, disgorgement plus prejudgment and post judgment interest,

14 and civil penalties for violations of Sections 10(b) and 15(a) of the

15 Securities Exchange Act of 1934 ("Exchange Act" ) [15 U.S.C. §§ 78j(b)

16 and o(a)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; Sections

17 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15

18 U.S.C. § 77e(a), e(c) and q(a)]; Section 7(a) of the Investment Company

19 Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7]; and Sections

20 206(1), (2) and (4) of the Investment Advisers Act of 1940 ("Advisers Act")

1 | [15 U.S.C. §§ 80b-6(1), (2) and (4)] and Rule 206(4)-8 [17 C.F.R. § 206(4)-
2 | 8] thereunder.

3 | JURISDICTION AND VENUE

4 |     8.    The Commission brings this action pursuant to the authority
5 | conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)],
6 | Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and
7 | 78(u)(e)], Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], and
8 | Section 42 of the Investment Company Act [15 U.S.C. § 80a-41].

9 |     9.    This Court has jurisdiction over this action pursuant to Section
10 | 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange
11 | Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-
12 | 14], Section 44 of the Investment Company Act [15 U.S.C. § 80a-43], and
13 | 28 U.S.C. § 1331.   Venue lies in this Court pursuant to Securities Act
14 | Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. §
15 | 78aa], Advisers Act Section 214 [15 U.S.C. § 80b-14], Investment
16 | Company Act Section 44 [15 U.S.C. § 80a-43], and 28 U.S.C. § 1391(b)(1)
17 | & (2).  Many of the acts, practices, and courses of conduct alleged in this
18 | Complaint occurred in this district and one or more defendants reside within
19 | this district.

20 |

1      10.    In connection with the transactions, acts, practices, and

2  courses of business described in this Complaint, the defendants, directly

3  and indirectly, have made use of the means or instrumentalities of

4  interstate commerce, of the mails, and/or of the means and instruments of

5  transportation or communication in interstate commerce.

6                              DEFENDANTS

7      11.    Spyglass is a California corporation with its principal place of

8  business in Los Angeles, California.  Between October 2007 and March

9  2009, Spyglass operated as a telemarketing firm or boiler room purportedly

10  selling equity trading systems.  It was owned and operated by defendants

11  Carter, Sjoblom and, until August 2008, Elliott.  Spyglass ceased

12  operations in March 2009; however, it is still listed with the State of

13  California as an active corporation.  Spyglass was not registered as a

14  broker-dealer or investment adviser with the Commission.

15      12.    Carter, age 42, is a resident of Torrance, California.  At all times

16  relevant to this Complaint, Carter was a co-owner and co-operator of

17  Spyglass.  Carter was also an owner and primary controller of The Trade

18  Tech Institute, Inc. ("Trade Tech"), which purportedly sells licensed

19  commodities and futures trading systems via telephone, and which Carter

20  continues to own and operate.  On information and belief, Trade Tech is a

1  telemarketing firm or boiler room similar to Spyglass.  Carter has never

2  been registered as a broker-dealer or investment adviser with the

3  Commission or associated with a registered broker-dealer or investment

4  adviser.

5      13.    Sjoblom, age 40, is a resident of Great Falls, Virginia.  In all

6  relevant periods, he was a principal and a co-owner of Spyglass and was

7  employed by Trade Tech as a sales and customer support representative.

8  Sjoblom has not been associated with a registered broker-dealer since

9  March 1998.  He has not otherwise been associated with any entity

10  registered with the Commission.

11      14.    Elliott, age 30, is a resident of Hermosa Beach, California.

12  From October 9, 2007 until August 18, 2008, he was a co-owner of

13  Spyglass.  In August 2008, Elliott sold his interest in Spyglass back to the

14  company.  Elliott was also an owner and primary controller of Trade Tech.

15  He currently owns and operates a telemarketing firm selling commodities

16  and futures trading systems.  He has never been registered with the

17  Commission in any capacity or associated with any registered entity.

18      15.    Flatiron Capital is a Delaware limited liability company

19  organized on May 23, 2007.  Between December 2007 and May 2008,

20  Flatiron Capital had offices in New York City, New York and operated as an

1 investment company, purportedly trading securities through the use of a

2 trading system called the Sequence Trading System ("Sequence"). At all

3 times relevant to this action, Howard was a co-managing member of

4 Flatiron Capital. Flatiron Capital is not registered with the Commission in

5 any capacity and has never filed a registration statement for its securities

6 with the Commission.

7     16. Flatiron Systems was at relevant times a Florida limited liability

8 company which was organized on March 24, 2008. Between April 2008

9 and March 2009, Flatiron Systems' principal place of business was in

10 Boynton Beach, Florida and it also operated out of Spyglass' offices in Los

11 Angeles, California. Flatiron Systems operated as an investment company

12 that purported to trade securities using a trading system called the

13 Pathfinder Trading System ("Pathfinder"). Howard was the sole managing

14 member of Flatiron Systems. Flatiron Systems was never registered with

15 the Commission in any capacity and has never filed a registration

16 statement for its securities with the Commission.

17     17. Howard, age 31, is a resident of New York, New York. He was

18 a co-managing member of Flatiron Capital and the sole managing member

19 of Flatiron Systems. He is currently employed as marketing director for

20 Forex Capital Trading Partners, Inc., a purported introducing broker in the

1 | foreign exchange market. Howard has never been registered or associated

2 | with any entity registered with the Commission. During the period at issue,

3 | Howard acted as an investment adviser with respect to Flatiron Capital and

4 | Flatiron Systems and investors in those entities.

5 | FACTUAL ALLEGATIONS

6 | Spyglass Induces Investors to Buy Securities Issued by Howard's Flatiron
Capital Using a Trading System as Bait

7 |

8 | 18. In 2007, Howard was engaging in the day-trading of stocks in

9 | downtown Manhattan. At the time, he and another individual he met

10 | through day-trading stocks decided to raise funds from investors through a

11 | recently formed company, Flatiron Capital, to trade in securities, preferably

12 | using an automated trading system.

13 | 19. By late 2007, Howard had made contact with an individual who

14 | had supposedly developed a trading system which became known as

15 | Sequence. Among other things, Sequence used signals and alerts that

16 | had been programmed into a trading platform to identify potential stocks for

17 | trading. Sequence was not an automated trading system was not a

18 | computer program and did not use algorithms to identify potential trades.

19 | 20. In late 2007, Howard met Sjoblom through the same individual

20 | who introduced him to Flatiron Capital. At the time, Sjoblom was working

at Trade Tech, the telemarketing firm in Los Angeles, purportedly selling

1  licenses to commodities and futures trading systems.  Shortly thereafter,

2  Howard agreed with Sjoblom, to use Spyglass to market Sequence and to

3  introduce investors to Flatiron Capital.  Spyglass was set up in the same

4  building as Trade Tech but on a different floor.  .

5      21.   During the relevant period, Spyglass essentially operated as a

6  boiler room, employing 10 to 15 telemarketers, some whom wanted to be

7  actors, to sell the Sequence system (and later the Pathfinder system as

8  discussed below) to investors and to introduce them to the Flatiron entities

9  using cold-calling techniques and lead lists.

10      22.   As indicated above, Carter, Elliott, and Sjoblom co-owned and

11  controlled Spyglass.  Carter handled all the back office accounting and

12  finances for Spyglass.  Elliott was in charge of hiring, training, and

13  supervising the sales staff until May 2008.   Sjoblom was responsible for

14  sales support and customer service, and after May 2008, was also in

15  charge of training and supervising the sales staff.  In addition to their

16  responsibilities as managers, Elliott, and Sjoblom also occasionally made

17  sales calls.

18  Spyglass Markets the Sequence Trading System and Introduces Investors
to Flatiron Capital Securities

19

20      23.   Beginning in November or December 2007, Spyglass promoted
the Sequence trading system.  During the period at issue, Spyglass

1   referred approximately 66 investors to Howard to purchase securities from

2   Flatiron Capital earning "licensing fees" or commissions of approximately

3   $380,000 and helping Howard to raise $602,465 in funds for Flatiron

4   Capital.

5       24.    Spyglass telemarketers told investors that they would be given

6   a limited opportunity to purchase a license to a proven stock trading system

7   – Sequence.  Sequence was essentially used to entice investors to place

8   funds with Flatiron Capital.  Howard allowed Spyglass to charge investors a

9   license fee, which essentially constituted a commission, so that Spyglass

10   would refer investors to Flatiron.  Spyglass typically charged about $6,000

11   per "license".

12       25.    Spyglass employed telemarketers who acted as "openers" and

13   "closers" in order to market and sell Sequence and to refer investors to

14   Flatiron Capital.  The telemarketers worked from scripts that were posted to

15   the walls of the Spyglass offices that were written primarily by Sjoblom and

16   Elliott, and sometimes reviewed by Howard.

17       26.    In marketing Sequence and to induce investors to purchase

18   Flatiron Capital securities, Spyglass, Carter, Sjoblom, Elliott, and and/or

19   telemarketers under their supervision and control falsely claimed or implied

20   that:

- Spyglass had been using Sequence to trade, or monitoring trading using Sequence, for more than 10 months and that that trading had generated net returns of over 12% or more per month.

- Sequence would generate automated trades, that trades would be selected using algorithms, or that trades would be selected by a computer program.

- Flatiron Capital was a prestigious firm trading institutional funds and retirement accounts.

- Flatiron Capital cleared through Morgan Stanley or Goldman Sachs.

- Sequence was a limited opportunity designed for high net-worth individuals.

27.  In fact, these claims were materially false and misleading because:

- Spyglass had not been using Sequence to trade, or monitoring trading using Sequence, for more than 10 months. Instead, Sjoblom first learned of Sequence in November 2007, at the earliest. Carter and Elliott, as well as Sjoblom, knew that Spyglass had not been using Sequence to trade, or monitoring trading using Sequence, for more than 10 months. In addition, at least Spyglass, Sjoblom and Elliot were aware that the information Spyglass received did not reflect actual trading.

- Sequence did not generate automated trades, select trades using algorithms, or use a computer program that selected trades. Rather, Sequence was a system of signals or information suggesting potential trades which the trader could follow or ignore

1

- Flatiron Capital was not a prestigious firm trading institutional funds and retirement accounts.

2

3

- Flatiron Capital did not clear its trades through Morgan Stanley or Goldman Sachs.

4

5

- Sequence was not a limited opportunity designed for high net-worth individuals. Instead, it was sold to anyone who wanted to buy it.

6       28.   Spyglass, Sjoblom, Elliott, and Carter each knew or was

7 reckless in not knowing that Sequence did not generate automated trades,

8 select trades using algorithms, or use a computer program that selected

9 trades.

10      29.   Spyglass, Sjoblom, Elliott, and Carter each knew or was

11 reckless in not knowing that Flatiron Capital was not a prestigious firm

12 trading institutional funds and retirement accounts, Flatiron Capital did not

13 clear its trades through Morgan Stanley or Goldman Sachs, and Sequence

14 was not a limited opportunity designed for high net-worth individuals.

15 The Spyglass Defendants Provided Sales Agreements to Investors that
Contained Additional Misleading Statements and Omissions

16

17      30.   In connection with the marketing of Sequence, interested

18 investors were mailed a sales agreement either electronically or through

19 the mail system.  The sales agreement provided that the "Customer wishes

20 to become a client of Spyglass by purchasing access to certain software for

use in trading equities" and "Spyglass is duly authorized and has the right

1  to sell various software including the System to Customer…".  "System"

2  was defined as the Sequence Trading System.

3       31.    The Sequence sales agreement further provided that investors

4  would have to establish a brokerage account to utilize the trading system.

5  The agreement stated that the "Customer hereby agrees to establish a

6  brokerage account ("Customer's Account") and to execute a limited power

7  of attorney granting the brokerage firm at which Customer's Account is held

8  the right to execute for Customer's Account all trades generated by the

9  System."  Investors were also mailed a "Sequence License Receipt" which

10  showed the "Brokerage Contact Person" as Howard at Flatiron Capital.

11       32.    In addition, the sales agreement contained a "Performance

12  Based Guarantee."  The Performance Based Guarantee provided that the

13  "Customer shall have the right … to request a refund of the purchase price

14  if the system fails to generate a net profit … at the conclusion of the one

15  hundred and eighty (180) day period."

16       33.    The Sequence sales agreement was materially false and

17  misleading because:

18  • Sequence was not a software program, but was rather a
    system of signals or information suggesting potential trades

19  which the trader could follow or ignore.

20  • Trading was not conducted solely through Sequence.

- Howard and Flatiron Capital were not registered broker-dealers, or associated with a registered broker-dealer.

- Howard and Flatiron Capital did not set up separate brokerage accounts for individual investors, but rather invested them with unaffiliated trading companies through which their funds were further commingled.

- Spyglass did not set aside funds necessary to meet the Performance Based Guarantee.

34. Spyglass and Sjoblom each knew or was reckless in not knowing that Sequence was not a software program.

35. Spyglass, Carter, Sjoblom, and Elliott each knew or was reckless in not knowing that Howard and Flatiron Capital were not registered brokers or associated with a registered broker-dealer, that they were not going to set up separate brokerage accounts for investors, and that funds were not set aside to meet the Performance Based Guarantee.

Howard and Flatiron Capital Made Additional Misleading Statements and Omissions to Investors

36. After an investor had purchased access to Sequence, the Spyglass defendants referred the investor to Howard and Flatiron Capital. Howard and Flatiron Capital mailed the investor a package including an "Operating Agreement of Flatiron Capital Partners for Sequence Trading System", a Sequence trading agreement, and a Sequence new account

1 application. The package also included a welcome letter from Howard

2 which directed investors to send funds to Flatiron Capital.

3      37.    Among other things, the trading agreement falsely stated that

4 Flatiron Capital would assign to the Client (i.e., the investor) one or more

5 "Designated Firm Accounts" which would be maintained by Flatiron Capital.

6 Similarly, the operating agreement defined "Designated Trading Account"

7 as a "separate trading account of the Company's (proprietary) trading

8 account established and maintained for each Member." In addition, the

9 welcome letter indicated that "all the account information for each account"

10 was included in the welcome package. It further requested that investors

11 fill out the paperwork and return it "along with funding for the account." In

12 fact, investors were not assigned "Designated Firm Accounts." Instead all

13 investor funds were deposited into a Flatiron Capital bank account and then

14 disbursed to accounts at unaffiliated trading companies where the funds

15 were comingled with funds of other unrelated investors.

16      38.    Howard and Flatiron Capital knew that investors were not

17 assigned "Designated Firm Accounts" and that, instead, all investor funds

18 were deposited into a Flatiron Capital bank account and then disbursed to

19 accounts not belonging to Flatiron Capital where the funds were comingled

20 with funds of other unrelated investors.

1    39.   The Sequence trading agreement also provided that the Client

2  would be entered into all trades executed by Sequence. This statement

3  was misleading because the trading agreement implied that investor funds

4  would be traded using Sequence. In fact, as discussed below, trading was

5  not limited to those "executed" by Sequence; rather, much of the trading

6  was executed by Howard along with others without using Sequence.

7  Howard and Flatiron Capital each knew or was reckless in not knowing that

8  trading using investor funds would not be limited to those directed by

9  Sequence.

10    40.   The trading agreement further falsely stated that the Client

11  would receive 80 percent of the trading profits generated by Flatiron

12  Capital, subject to a two percent management charge. In fact, Howard and

13  Flatiron Capital used investor funds in excess of their allotted share to pay

14  trading expenses, the business expenses of Flatiron Capital and personal

15  expenses of Howard, including rent, personal and adult entertainment, and

16  gifts for his girlfriend.

17  Howard and Flatiron Capital's Trading of Investor Funds Was Not Profitable

18    41.   Instead of placing investor funds into separate brokerage

19  accounts, Flatiron Capital and Howard pooled investor funds and placed

20  them with certain unaffiliated trading companies that were not registered

1  broker-dealers but which allowed customers to deposit funds into pooled
2  accounts and make self-directed trades through those accounts.

3      42.    While Spyglass and Flatiron Capital had represented that
4  trading in stock or equities would be based on the operation of Sequence,
5  not all the trading was based on Sequence but, instead, some was
6  determined by Howard and others who invested not only in equities, but in
7  commodities and other instruments.  Flatiron Capital did not keep sufficient
8  records to determine which investor funds were traded using Sequence
9  and which investor funds were traded by Howard and others.

10     43.    By March, 2008, it was clear that the trading conducted by
11  Flatiron Capital for the investors was not profitable.  As a result, Sjoblom
12  told Howard that he was concerned that Spyglass would have to make
13  refunds based on the Performance Based Guarantee in the Sequence
14  Sales Agreement which provided that Spyglass would refund the license
15  fees if Sequence did not deliver profitable trading results after 180 days.

16     44.    Howard told Sjoblom that he was considering a new trading
17  system, the Pathfinder system, being developed by another individual.
18  Despite the fact that Pathfinder was not fully developed, Sjoblom and
19  Howard decided to market Pathfinder to investors through Spyglass and
20  Howard's newly-formed entity, Flatiron Systems.

1  Sjoblom and Howard Induce Existing Flatiron Capital Investors to Transfer
   their Funds from Sequence to Pathfinder using a Misleading Offer Letter

2

3      45.    In March 2008, Sjoblom drafted a letter for Spyglass to send to

4  existing Flatiron Capital investors and he sent it to Howard for Howard's

5  approval.  The purpose of the letter was to market the Pathfinder system

6  and to induce existing Flatiron Capital investors to move their investments

7  to the new entity, Flatiron Systems, and a new ostensible trading system,

8  Pathfinder.  Howard agreed that Spyglass should issue the letter and in

9  April 2008, the letter was sent to Sequence investors.

10     46.    The Pathfinder System Offer letter directed investors to fill out

11 an enclosed form and send it to Howard at Flatiron Systems.  The form

12 authorized Howard to transfer the investors' funds from Sequence to

13 Pathfinder.  Some but not all of the Sequence investors agreed to transfer

14 their funds.

15     47.    The Pathfinder System Offer letter falsely represented that:

16       • "Recently the Sequence system has done an excellent job of
           holding fast during the extraordinarily tough market
17         conditions" but that "the reversals that are constantly
           occurring during the day while the markets are trading cause
18         for an overall flat result on Sequence".

19       • Pathfinder was "[a] system that can do extremely well in
           these market conditions and has proved itself in every way"
20         and that "[r]esults from January, February, and March 2008
           are stellar" resulting in returns ranging from 23.5% per
           month to over 100% per month.

48.     The letter was materially false and misleading because:

- Sequence had not done an excellent job of holding fast during the extraordinarily tough market conditions. Nor was there "an overall flat result [using] Sequence." In fact, Flatiron Capital was suffering trading losses.

- At the time the Pathfinder System Offer letter was sent to investors, Pathfinder was incomplete, had not proven itself in any way, and had not generated any actual returns.

49.     Sjoblom, Carter, Elliott, and Howard all knew or were reckless in not knowing that Flatiron Capital was suffering trading losses. Sjoblom and Howard each knew or was reckless in not knowing that Pathfinder was incomplete, had not proven itself in any way, and had not generated any actual returns.

Spyglass Markets Pathfinder and Introduces Investors to Flatiron Systems Securities

50.     By April 2008, Spyglass began to cold-call investors to market the new trading system, Pathfinder. During the period at issue, Spyglass referred approximately 126 new investors to purchase securities from Flatiron Systems, earning "licensing fees" or commissions of approximately $750,000 and raising $1,548,000 in capital for Flatiron Systems.

51.     Sjoblom, Elliott, and Carter participated in drafting the sales scripts that were used by the Spyglass telemarketers to market Pathfinder and to locate investors to refer to Flatiron Systems. The scripts were

1  placed on the walls of Spyglass' offices and telemarketers continued to use

2  cold-calling techniques and lead lists to locate investors.

3      52.    In marketing Pathfinder and to induce investors to purchase

4  Flatiron Systems securities, Spyglass, Carter, Elliott, Sjoblom, and/or

5  telemarketers under their supervision and control falsely claimed or implied

6  that:

7      • Pathfinder had been trading live for over a year and that that
          trading had generated returns of an average of 20% or more
8          per month.

9      • Pathfinder would generate automated trades, that trades
          would be selected using algorithms or that trades would be
10         selected by a computer program.

11     • Flatiron Systems was a prestigious and reputable firm.

12     • Flatiron Systems cleared through Morgan Stanley or
          Goldman Sachs.
13

14     • Pathfinder was a limited opportunity.

15     53.    These representations were materially false and misleading

16  because:

17     • Pathfinder was not completed at the time Spyglass began
          selling it.  Even in January 2009, when Spyglass was making
          its last sales, Pathfinder had been in existence for less than
18         a year.  Pathfinder never generated returns in excess of 20%
          per month.
19

20     • Pathfinder did not generate automated trades, select trades
          using algorithms, or use a computer program that selected

1   trades.  Rather, Pathfinder was a system of signals or
    information suggesting potential trades which the trader
2   could follow or ignore.

3       • Flatiron Systems was not a prestigious or reputable firm.

4       • Flatiron Systems did not clear its trades through Morgan
          Stanley or Goldman Sachs.
5
        • Pathfinder was not a limited opportunity.  Instead, it was sold
6         to everyone who wanted to buy it.

7       54.   Spyglass, Sjoblom, Elliott, and Carter each knew or was

8   reckless in not knowing that the above statements and misrepresentations

9   were materially false and misleading.

10  The Spyglass Defendants Provided Sales Agreements to Investors that
    Contained Additional Misleading Statements and Omissions
11
        55.   Similar to the procedures established relating to the Sequence
12
    system, the Spyglass defendants provided a written sales agreement to
13
    investors who were interested in Pathfinder.  In fact, the Pathfinder sales
14
    agreement was nearly identical to the Sequence sales agreement.
15
        56.   The Pathfinder sales agreement provided that the "Customer
16
    wishes to become a client of Spyglass by purchasing access to certain
17
    software for use in trading equities;" and "Spyglass is duly authorized and
18
    has the right to sell various software including the System to Customer…".
19
    "System" was defined as the Pathfinder Trading System.
20

1       57.   The Pathfinder sales agreement further provided that investors

2  would have to establish a brokerage account to utilize the trading system

3  and trade equities.  The agreement stated that the "Customer hereby

4  agrees to establish a brokerage account ("Customer's Account") and to

5  execute a limited power of attorney granting the brokerage firm at which

6  Customer's Account is held the right to execute for Customer's Account all

7  trades generated by the System."  Investors were also mailed a "Pathfinder

8  License Receipt" which showed the "Brokerage Contact Person" as

9  Howard at Flatiron Systems.

10      58.   In addition, the Pathfinder sales agreement contained a

11  "Performance Based Guarantee."  The Performance Based Guarantee

12  provided that the "Customer shall have the right … to request a refund of

13  the purchase price if the system fails to generate a net profit … at the

14  conclusion of the one hundred and eighty (180) day period."

15      59.   The Pathfinder sales agreement was materially false and

16  misleading because:

17             • Pathfinder was not a software program but was rather a
                system of signals or information suggesting potential trades
18             which the trader could follow or ignore.

19             • Trading was not limited to stocks or equities, but instead
                included commodities, futures, and risky off-market
20             investments.

- Howard and Flatiron Systems were not registered broker-dealers or associated with a registered broker-dealer.

- Howard and Flatiron Systems did not set up separate brokerage accounts for individual investors, but rather invested them with unaffiliated trading companies through which their funds were further commingled.

- Spyglass did not set aside funds to meet the Performance Base Guarantee.

60.     Spyglass, Sjoblom, Elliott, and Carter each knew, or was reckless in not knowing, that Pathfinder was not a software program.

61.     Spyglass and Carter each knew that trading was not limited to equities because Carter requested that investor funds be invested in off-market investments.

62.     Spyglass, Carter, Elliott, and Sjoblom each knew or was reckless in not knowing that neither Howard nor Flatiron Systems were registered broker-dealers or associated with a registered broker-dealer.

Howard and Flatiron Systems Made Additional Misleading Statements and Omissions to Investors

63.     Similar to the procedure that was established for Sequence, after an investor had purchased access to Pathfinder, the Spyglass defendants referred the investor to Howard and Flatiron Systems. Thereafter, Howard caused an investor package to be mailed to the prospective investors through an administrative assistant hired by Carter

1   and located at the Spyglass offices.  The package included an "Operating

2   Agreement of Flatiron Systems for Pathfinder Trading System", a

3   Pathfinder trading agreement, and a new account application.  The

4   package also included a welcome letter from Howard and funding

5   instructions.  The welcome letter instructed investors to return the signed

6   documents to the Flatiron Systems administrative assistant at Spyglass

7   and to send funds to accounts controlled by Howard.

8        64.    The Pathfinder welcome letter from Howard falsely stated that

9   "[w]e at Flatiron Systems … believe that the Pathfinder System will

10  continue to have the incredible success we have seen throughout the

11  year."  In fact, Pathfinder had not had "incredible success seen throughout

12  the year."  It either was not ready for trading or was generating poor

13  returns.

14       65.    Flatiron Systems, Howard, Spyglass, Carter, Elliott, and

15  Sjoblom each knew or was reckless in not knowing that Pathfinder had not

16  had "incredible success seen throughout the year" and was either not ready

17  for trading or was generating poor returns.

18       66.    Among other things, the Pathfinder trading agreement falsely

19  represented that Flatiron Systems would assign to the Client (i.e., the

20  investor) one or more "Designated Firm Accounts" which would be

1  maintained by Flatiron Systems. Similarly, the Pathfinder Operating

2  Agreement defined "Designated Trading Account" as a "separate sub-

3  account of the Company's (proprietary) trading account established and

4  maintained for each Member." In fact, investors were not assigned

5  separate accounts. Nor did Flatiron Systems have a proprietary trading

6  account. Instead all investor funds were deposited into a Flatiron Systems

7  bank account and then disbursed to accounts belonging to unaffiliated

8  trading companies where the funds were comingled with funds of other

9  unrelated investors.

10  67.  Howard and Flatiron Systems each knew or was reckless in not

11  knowing that investors were not assigned separate accounts or sub-

12  accounts and that, instead, all investor funds were deposited into a Flatiron

13  Systems bank account and then disbursed to accounts not belonging to

14  Flatiron Systems where the funds were comingled with funds of other

15  unrelated investors.

16  68.  The Trading Agreement also provided the Client would be

17  entered into all trades executed by Pathfinder. This statement was

18  misleading because while the Pathfinder trading agreement implied that

19  investor funds would be traded using Pathfinder; as discussed below,

20  trading was not limited to those "executed" by Pathfinder and trades were

1  executed by Howard and others involving equities, commodities, futures,

2  and off-market investments.  Howard, Flatiron Systems, and Carter each

3  knew or was reckless in not knowing that trading using investor funds

4  would not be limited to those directed by Pathfinder.

5      69.    The Pathfinder trading agreement further falsely stated that the

6  Client would receive 80 percent of the trading profits generated by Flatiron

7  Systems subject to a two percent management charge.  In fact, Howard

8  and Flatiron Systems used investor funds to pay trading expenses, the

9  business expenses of Flatiron Systems, and personal expenses of Howard,

10  including rent, personal and adult entertainment, and gifts for his girlfriend.

11  <u>Howard's and Flatiron Systems' Trading of Investor Funds Was Not</u>

12  <u>Profitable</u>

13      70.    Similar to the investor funds associated with Flatiron Capital,

14  Howard and Flatiron Systems deposited the funds they received from

15  investors into pooled accounts with certain unaffiliated trading companies

16  that were not registered broker-dealers but which allowed their customers

17  to deposit funds into pooled accounts and make self-directed trades

18  through those accounts.

19      71.    While Flatiron Systems and Spyglass had represented that

20  trading would be limited to stocks or equities and be based on the

1  operation of Pathfinder, not all the trading was in equities or based on

2  Pathfinder. Howard and several others also traded investor funds. Among

3  other investments, Howard allowed some investor funds to be used to trade

4  in oil and gas futures. In addition, at least $250,000 of investor funds was

5  used by Howard, at Carter's request, to fund a private placement

6  connected to Carter and a business venture of Carter's.

7      72.    Flatiron Systems did not keep sufficient records to determine

8  which investor funds were traded using Pathfinder and which investor funds

9  were traded without using Pathfinder.

10      73.    Howard's and Flatiron Systems' trading and investments of

11  investor funds was not profitable and investors incurred significant losses.

12  The Scheme Unravels and Howard Falsifies Account Statements and
   Makes False and Misleading Lulling Statements

13

14      74.    By mid-2008, it was clear that both Sequence and Pathfinder

   were not profitable trading systems, and investors were suffering losses. In

15
   addition, some investors were reaching the 180 day time period for the
16
   Performance Based Guarantee. In June, 2008, at the request of Spyglass,
17
   Carter, and Sjoblom, Howard "subsidized" several investors, falsifying their
18
   account statements to reflect higher results than actually occurred.
19

20

1    75.   In December 2008, Howard sent a false and misleading letter to

2   investors for the purpose of lulling them and concealing the fraudulent

3   scheme.  The letter falsely represented, among other things, that:

- "[T]rading has been voluntarily halted by [Howard] so that a voluntary, independent audit can be performed of the accounting done by Pathfinder Trading Technologies, LLC and the accounting firm hired by Pathfinder Trading Technologies, LLC  which has been managing the statements to members of Flatiron Systems, LLC."

- The audit was initiated "as a result of noticing what may be possible discrepancies by the accounting firm and/or Pathfinder Trading Technologies, LLC in recent statements that have been received."

- The audit would take no longer than 60 days.

- After the audit was completed either "the accounts will all be closed and your [sic] will promptly receive your remaining distribution" or "you will have your choice to close your account and take the remaining funds in distribution or continue trading through a different LLC..."

     76.   The December 2008 letter was materially false and misleading because:

- There was no audit.

- Pathfinder Trading Technologies, LLC did not exist.

- Howard and Flatiron Systems did not stop trading voluntarily but rather because their trading had been unsuccessful, resulting in the loss of a significant portion of the investors' money.

- Flatiron Systems did not set up brokerage accounts for individual investors but instead pooled investor funds.

77. Howard and Flatiron Systems each knew or was reckless in not knowing that the December 2008 letter was materially false and misleading.

78. In March 2009, Howard drafted another lulling letter that made additional false statements. The letter falsely stated, "[a]fter meeting with the accountants we were forced to realize that the audit procedures … are taking much longer than expected." The letter went on to state, "[w]ith the total collapse of the U.S. capital markets, and subsequent equities market decline, public accounting firms are very overburdened with work … I assure you that my attorneys' [sic] and accountants have been diligently working on every aspect of this."

79. Howard's statements in the March 2009 letter were false. In truth, Howard never met with or hired accountants to perform an audit. In addition, Howard never hired attorneys for an audit. Howard and Flatiron Systems each knew or was reckless in not knowing that the March 2009 letter was materially false and misleading.

Flatiron Systems and Spyglass Shut Down

80. In early 2009, soon after the March lulling letter, Howard and Flatiron Systems ceased business operations, their phone numbers were

1 | disconnected or changed, and investors were no longer able to contact
2 | them.

3 |     81.   As it became evident that the Pathfinder investment had been
4 | unprofitable, investors began contacting Spyglass in increasing numbers
5 | and requesting refunds of the license fee they had paid as provided in the
6 | Performance Guarantee provisions of the Sales Agreement. However,
7 | Spyglass had not reserved any of the sales proceeds to cover refunds.
8 | Only a few investors were granted refunds by Spyglass and some of those
9 | investors received only partial payments.

10 |     82.   By early 2009, Spyglass, Sjoblom, and Carter had stopped all
11 | communications with investors, closed their offices and disconnected their
12 | telephones.

13 | <u>Defendants Received and Misappropriated Investor Funds</u>

14 |     83.   Spyglass received approximately $380,000 from its sales of
15 | Sequence and approximately $750,000 from its sales of Pathfinder for
16 | "licensing fees" or commissions.

17 |     84.   Between December 2007 and February 2009, Spyglass paid
18 | Carter $139,260.

19 |     85.   Between December 2007 and February 2009, Spyglass paid
20 | Sjoblom $208,916.

1         86.    Between December 2007 and February 2009, Spyglass paid

2    Elliott $170,988.

3         87.    Howard deposited investor funds in his personal bank account

4    and used checks and debit cards for the Flatiron Capital or Flatiron

5    Systems bank account holding investor funds to pay personal expenses

6    such as rent and to buy clothing, jewelry for himself, a necklace from

7    Tiffany's for his girlfriend, and flowers for his girlfriend.  Howard also spent

8    large amounts of investor funds for entertainment, including adult

9    entertainment, often in the company of Carter, spending as much as

10   $5,000 per night.

11        88.    Between December 2007 and February 2009, Howard

12   misappropriated or misused almost $500,000 in investor funds.

13        89.    Between December 2007 and February 2009, Spyglass paid

14   Howard $20,400.

15   Howard, Flatiron Capital and Flatiron Systems Sold Unregistered Securities

16        90.    Section 5 of the Securities Act prohibits any offers, directly or

17   indirectly, to sell a security unless a registration statement for that security

18   has been filed with the Commission.   A registration statement is

19   transaction specific.  Each sale of a security must either be made pursuant

20   to a registration statement or fall under a registration exemption.

1    91.   Howard, Flatiron Capital, and Flatiron Systems sold securities

2    in the form of LLC membership interests in Flatiron Capital and Flatiron

3    Systems to investors referred to them by Spyglass using the mails or

4    systems of interstate commerce.  Flatiron Capital securities were offered

5    and sold in at least 38 states and Flatiron Systems securities were offered

6    and sold in at least 24 states.  The membership interests in Flatiron

7    Capital and Flatiron Systems were investment contracts, which are

8    securities under federal law.   At the time of the offers and sales of the

9    securities in Flatiron Capital and Flatiron Systems, there were no

10   registration statements filed or in effect for them and no registration

11   exemption applied to sales of those securities.

12   Spyglass, Sjoblom, Carter, and Elliott Acted as Unregistered Broker-
     Dealers

13

14    92.   Section 15(a)(1) of the Exchange Act prohibits a broker or

      dealer from using jurisdictional means such as the telephone or mails to

15
      effect transactions in securities unless the broker or dealer is registered

16
      with the Commission.  Section 3(a)(4) of the Exchange Act defines a

17
      "broker" as any person who is engaged in the business of effecting

18
      transactions in securities for the accounts of others.

19
      93.   Sjoblom, Carter and Elliot, the principals of Spyglass, hired and

20
      controlled a sales force to solicit investors nationwide by telephone.

1  Spyglass's sales force actively recruited investors, advised them on the

2  merits of an investment with Flatiron Capital or Flatiron Systems, and then

3  put them in contact with Howard to complete the transaction.  Spyglass and

4  its principals were compensated for each transaction that they helped to

5  complete.

6      94.    In some instances, Sjoblom and Elliot personally recruited

7  investors, advised them on the merits of an investment with the Flatiron

8  entities, and then put them in contact with Howard to complete the

9  transaction.  Sjoblom and Elliot received additional compensation for each

10  individual transaction that they personally helped to complete.

11      95.    Spyglass, Sjoblom, Carter and Elliot were not registered with

12  the Commission as broker-dealers and they were not affiliated with any

13  broker-dealers at the time of the offers and sales of Flatiron Capital or

14  Flatiron Systems securities.

15  Flatiron Capital and Flatiron Systems Failed to Register as Investment
   Companies
16
17      96.    Flatiron Capital and Flatiron Systems were investment

18  companies.  Section 3(a)(1) of the Investment Company Act  defines

   "investment company" to include "any issuer which – (A) is or holds itself
19
   out as being engaged primarily, or proposes to engage primarily, in the
20
   business of investing, reinvesting, or trading in securities."  The only

1 | business that Flatiron Capital and Flatiron Systems proposed to engage in,

2 | and did engage in, was the investing, reinvesting, or trading in securities.

3 |     97.    Section 3(c) excludes several categories of businesses from

4 | the definition of investment company; however, Flatiron Capital and Flatiron

5 | Systems do not fall within any of these categories.  Specifically Flatiron

6 | Capital and Flatiron Systems are not excluded under Sections 3(c)(1) and

7 | (7) of the Investment Company Act because their securities were sold in

8 | public offerings to individuals who were not "qualified purchasers".

9 |     98.    Section 7(a) of the Investment Company Act prohibits

10 | investment companies from, among other things, offering or selling

11 | securities through interstate commerce unless they are registered under

12 | the Act.  As previously described, Flatiron Capital and Flatiron Systems

13 | securities were offered to investors nationwide.  Flatiron Capital securities

14 | were offered and sold in at least 38 states and Flatiron Systems securities

15 | were offered and sold in at least 24 states.

16 |     99.    Although required to do so, neither Flatiron Capital nor Flatiron

17 | Systems registered with the Commission as an investment company at any

18 | time.

19 |

20 |

1

Howard Was an Investment Adviser to Flatiron Capital and Flatiron
Systems

2

3

100. Section 202(a)(11) of the Investment Advisers Act defines the

term "investment adviser" to mean any person who, for compensation,

4

engages in the business of advising others, either directly or through

5

publications or writings, as to the value of securities, or who, for

6

compensation and as part of a regular business, issues or promulgates

7

analyses or reports concerning securities.

8

101. Howard was a managing member of both Flatiron Capital and

9

Flatiron Systems. Howard initially shared management responsibilities with

10

a co-manager at Flatiron Capital and then later took on all of the

11

responsibilities. At Flatiron Systems, Howard was the sole managing

12

member and exercised complete control. As a managing member of

13

Flatiron Capital and Flatiron Systems, Howard directed the investments by

14

the funds; investing their assets in equities, commodities and private

15

placements.

16

102. Howard advised Flatiron Capital and Flatiron Systems on the

17

value and trading of securities in exchange for compensation. Howard

18

received approximately $36,000 in compensation from Flatiron Capital and

19

approximately $281,000 from Flatiron Systems.

20

1    103.  Therefore, Howard was an investment adviser to Flatiron

2  Capital and Flatiron Systems as defined under Section 202(a)(11) of the

3  Investment Advisers Act.

## CLAIMS FOR RELIEF

### FIRST CLAIM
Against Howard, Flatiron Capital and Flatiron Systems
Fraud in the Offer or Sale of Securities
Violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)]

8    104.  As a result of the conduct alleged in paragraphs 1 through 103,

9  defendants Flatiron Capital, Flatiron Systems and Howard have, directly or

10  indirectly, with scienter, in the offer or sale of securities, by use of the

11  means or instruments of transportation or communication in interstate

12  commerce or by use of the mails, employed a device, scheme, or artifice to

13  defraud in violation of Section 17(a)(1) of the Securities Act.

14    105.  As a result of the conduct alleged in paragraphs 1 through 103,

15  defendants Flatiron Capital, Flatiron Systems and Howard have, directly or

16  indirectly, in the offer or sale of securities, by use of the means or

17  instruments of transportation or communication in interstate commerce or

18  by use of the mails obtained money or property by means of untrue

19  statements of material fact or by omissions to state material facts

20  necessary to make the statements made, in light of the circumstances

1  under which they were made, not misleading in violation of Section 17(a)(2)

2  of the Securities Act.

3  106.  As a result of the conduct alleged in paragraphs 1 through 103,

4  defendants Flatiron Capital, Flatiron Systems and Howard engaged in

5  transactions, practices, or courses of business which have been or are

6  operating as a fraud or deceit upon the purchasers of securities in violation

7  of Section 17(a)(3) of the Securities Act.

8  107.  Unless restrained and enjoined defendants Flatiron Capital,

9  Flatiron Systems and Howard will, in the future, violate Section 17(a) of the

10  Securities Act.

11  SECOND CLAIM<br>Against All Defendants

12  Fraud in the Purchase or Sale of Securities<br>Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

13  [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

14  108.  As a result of the conduct alleged in paragraphs 1 through 103,

15  defendants Spyglass, Carter, Sjoblom, Elliott, Flatiron Capital, Flatiron

16  Systems and Howard have, directly or indirectly, with scienter, by use of

17  means or instrumentalities of interstate commerce or of the mails, or of any

18  facility of a national securities exchange, used or employed, in connection

19  with the purchase or sale of a security, a manipulative or deceptive device

20  or contrivance in contravention of the rules and regulations of the SEC;

1 | employed devices, schemes or artifices to defraud; made untrue

2 | statements of material fact or omitted to state material facts necessary in

3 | order to make the statements made, in light of the circumstances under

4 | which they were made, not misleading; or engaged in acts, practices or

5 | courses of business which operated or would operate as a fraud or deceit

6 | upon any person, in violation Section 10(b) of the Exchange Act and Rule

7 | 10b-5 thereunder.

8 | 109.  Unless restrained and enjoined defendants Spyglass, Carter,

9 | Sjoblom, Elliott, Flatiron Capital, Flatiron Systems and Howard will, in the

10 | future, violate Section 10(b) of the Exchange Act and Rule 10b-5

11 | thereunder.

12 |
### THIRD CLAIM
#### Against Howard
13 | Fraud by an Investment Advisor
Violations of Sections 206(1), (2) and (4) and Rule 206(4)-8 of the
14 | Advisers Act
[15 U.S.C. §§ 80b-6(1), (2) and (4) and 17 C.F.R. § 275.206(4)-8]

15 |
110.  As a result of the conduct alleged in paragraphs 1 through 103,
16 | defendant Howard, while acting as an investment adviser, has, directly or
17 | indirectly, with scienter, by use of the means or instruments of interstate
18 | commerce or by use of the mails, employed devices, schemes, or artifices
19 | to defraud clients or prospective clients; engaged in transactions, practices,
20 | or courses of business which operated or operate as a fraud or deceit upon

Page 40

1 | any client or prospective client; and engaged in acts, practices, or courses

2 | of business which are fraudulent, deceptive, or manipulative.

3 |     111. Among other things, Howard made untrue statements of

4 | material facts and omitted to state material facts necessary to make the

5 | statements made, in the light of the circumstances under which they were

6 | made, not misleading, to any investor or prospective investor in pooled

7 | investment vehicles; and Howard otherwise engaged in acts, practices, or

8 | courses of business that are fraudulent, deceptive, or manipulative with

9 | respect to any investor or prospective investor in the pooled investment

10 | vehicle.

11 |     112. Unless restrained and enjoined defendant Howard will, in the

12 | future, violate Section 206 of the Advisers Act.

13 | FOURTH CLAIM<br>Against Spyglass, Carter, Sjoblom and Elliott

14 | Aiding and Abetting Fraud by an Investment Advisor<br>Aidng and Abetting Violations of Section 206(4)

15 | and Rule 206(4)-8 of the Advisers Act<br>[15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8]

16 |

17 |     113. As a result of the conduct alleged in paragraphs 1 through 103,

18 | defendant Howard, engaged in violations of Section 206(4) of the Advisers

    Act and Rule 206(4)-8 thereunder.

19 |

20 |

1        114. Spyglass, Carter, Sjoblom and Elliott, with scienter, provided

2   substantial assistance to Howard's violations of Section 206 (4) of the

3   Advisers Act and Rule 206(4)-8 thereunder.

4        115. Unless restrained and enjoined defendant Spyglass, Carter,

5   Sjoblom and Elliot will, in the future, aid and abet violations of Section

6   206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

7                              FIFTH CLAIM
             Against Howard, Flatiron Capital and Flatiron Systems

8                   Unregistered Sale of Securities
        Violations of Sections 5(a) and 5(c) of the Securities Act

9                [15 U.S.C. §§ 77e(a) and e(c)]

10       116. As a result of the conduct alleged in paragraphs 1 through 103,

11   defendants Flatiron Capital, Flatiron Systems and Howard have, directly or

12   indirectly, made use of the means or instruments of transportation or

13   communication in interstate commerce or of the mails to offer and sell

14   securities, and carried or caused to be carried through the mails, or in

15   interstate commerce, by means or instruments of transportation, such

16   securities for the purpose of sale or for delivery after sale, when no

17   registration statement had been filed or was in effect as to such securities

18   in violation of Section 5(a) and 5(c) of the Securities Act.

19

20

1   117.  Unless restrained and enjoined, defendants Flatiron Capital,

2   Flatiron Systems and Howard will, in the future, violate Sections 5(a) and

3   5(c) of the Securities Act.

4   

SIXTH CLAIM
Against Spyglass, Carter, Sjoblom and Elliott
Offers and Sales of Securities by an Unregistered Broker-Dealer
Violations of Exchange Act Section 15(a)
[15 U.S.C. § 78o(a)]

5

6

7   118.  As a result of the conduct alleged in paragraphs 1 through 103,

8   defendants Spyglass, Carter, Sjoblom and Elliott have, while not registered

9   as or associated with a broker or dealer made use of the means or

10   instruments of interstate commerce to induce or attempt to induce the

11   purchase or sale of, a security in violation of Section 15(a) of the Exchange

12   Act.

13   119.  Unless restrained and enjoined defendants Spyglass, Carter,

14   Sjoblom and Elliott will, in the future, violate Section 15(a) of the Exchange

15   Act.

16   

SEVENTH CLAIM
Against Flatiron Capital and Flatiron Systems
Offers and Sales of Securities by an
Unregistered Investment Company
Violations of Investment Company Act Section 7(a)
[15 U.S.C. § 80a-7]

17

18

19

20   120.  As a result of the conduct alleged in paragraphs 1 through 103,

defendants Flatiron Capital and Flatiron Systems have, while not registered

1 | as an Investment Company, have made use of the means or instruments of

2 | interstate commerce to induce or attempt to induce the purchase or sale of

3 | a security in violation of Section 7(a) of the Investment Company Act.

4 |     121. Unless restrained and enjoined defendants Flatirons Capital

5 | and Flatiron Systems will, in the future, violate Section 7(a) of the

6 | Exchange Act.

7 | PRAYER FOR RELIEF

8 |     WHEREFORE, the Commission respectfully requests that this Court:

9 | Find that defendants Spyglass, Carter, Sjoblom, Elliott, Flatiron Capital,

10 |     Flatiron Systems and Howard committed the violations alleged;

11 |     I.    Enter an Injunction, in a form consistent with Rule 65(d) of the

12 | Federal Rules of Civil Procedure, permanently restraining and enjoining

13 | defendants Spyglass, Carter, Sjoblom, Elliott, Flatiron Capital, Flatiron

14 | Systems and Howard, his or its agents, employees, and all persons in

15 | active concert or participation with them, from violating, directly or indirectly,

16 | the laws and rules alleged in this Complaint;

17 |     II.    Order that defendants Spyglass, Carter, Sjoblom, Elliott,

18 | Flatiron Capital, Flatiron Systems and Howard disgorge all ill-gotten gains,

19 | including pre- and post-judgment interest, in the form of any benefits of any

20 |

1   kind received as a result of the acts and courses of conduct in this

2   Complaint;

3       III.    Order that defendants Spyglass, Carter, Sjoblom and Elliott pay

4   civil penalties, including post-judgment interest, pursuant to Section 21(d)

5   of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(e) of the

6   Adviser's Act [15 U.S.C. § 80b-9(e)];

7       IV.    Order that defendant Howard pay civil penalties, including post-

8   judgment interest, pursuant to Section 20(d) of the Securities Act [15

9   U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]

10   and Section 209(e) of the Adviser's Act[15 U.S.C. § 80b-9(e)]; and

11      V.     Order that defendants Flatiron Capital and Flatiron Systems

12   pay civil penalties, including post-judgment interest, pursuant to Section

13   20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the

14   Exchange Act [15 U.S.C. § 78u(d)] and Section 42(e) of the Investment

15   Company Act [15 U.S.C. § 80a-41(e)]; and

16      VI.    Order such other relief as is necessary and appropriate.

17

18                              Respectfully Submitted

19                              _____

20                              David J. Van Havermaat
                                Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV11- 2371 RGK (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Polly A. Atkinson
Stephen C. McKenna
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF(S)<br>v.<br>Spyglass Equity Systems, Inc.,<br>Richard L. Carter,<br>Preston L. Sjoblom,<br>Tyson D. Elliott,<br>Flatiron Capital Partners, LLC,<br>Flatiron Systems, LLC, and<br>David E. Howard II<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV11 02371 RGK (MANx)**<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Polly Atkinson and Stephen McKenna_, whose address is _Securities and Exchange Commission, 1801 California St., Ste. 1500, Denver, CO 80202_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____MAR 2 1 2011_____

By: _____**CHRISTOPHER POWERS**_____

Deputy Clerk

*(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**COPY**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) SECURITIES AND EXCHANGE COMMISSION | DEFENDANTS SPYGLASS EQUITY SYSTEMS, INC., RICHARD L. CARTER, PRESTON L. SJOBLOM, TYSON D. ELLIOTT, FLATIRON CAPITAL PARTNERS, LLC., FLATIRON SYSTEMS, LLC., AND DAVID E. HOWARD II  Los Angeles County |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)  Polly Atkinson and Stephen McKenna, SEC, 1801 California St., Ste 1500, Denver, CO 80202; Ph. (303)844-1000. Dave J.Van Havermaat, SEC 5670 Wilshire Blvd, 11th Floor, Los Angeles, CA, 90036, (323) 965-3866 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No  ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 77e(a) and e(c), 77q(a), 78j(b), 78o(a), 80a-7, and 80b-6(1), (2), and (4); Fraud in the offer and sale of securities

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV11   02371**

**FOR OFFICE USE ONLY:**  Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): CV11 02163 GHK PLA

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☑ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
|  |  |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| Spyglass Equity Systems, Inc- Los Angeles; Richard Carter- Los Angeles; Tyson Elliott- Los Angeles | Preston Sjoblom- Virginia; Flatiron Capital Partners- Delaware; Flatiron Systems, LLC- Florida; David Howard II- New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| Los Angeles | New York |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date  3/21/11

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |